**Wheeler J. WITTE, Plaintiff,**

v.

**William J. MYERS and Local #324, International Union of Operating Engineers, Defendants.**

**Civ. A. No. 6221.**

United States District Court,
W. D. Michigan, S. D.

Oct. 8, 1971.

Jeremy J. Hickman, Burr & Hickman, Grand Rapids, Mich., for plaintiff.

Donald F. Sugerman, Sharples, Klein, Meizlish & Sugerman, Detroit, Mich., for defendants; Boaz Siegel, Detroit, Mich., of counsel.

## OPINION

ENGEL, District Judge.

### THE ACTION

Wheeler J. Witte brings this action against William J. Myers and Local 324, International Union of Operating Engineers pursuant to Title I, Sections 101, 102 and 609 of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 411, 412 and 529. It is plaintiff's claim that on March 8, 1969, he was discharged as business agent of Local 324 in charge of its branch office in Grand Rapids, Michigan "in violation of Title I, Section 2 of the Labor Management Reporting and Disclosure Act (LMRDA) for advocating views, arguments and opinions privately and at meetings of said local 324, said views, arguments and opinions being politically contra to the defendant William J. Myers, including the advocating of a District form of union government and an apprentice and training center located in western Michigan and the election of local business agents by the rank and file membership, inter alia."

Plaintiff's complaint further alleges that he was denied due process in that he was not served with written specific charges, nor given a reasonable time to prepare a defense, nor afforded a fair hearing in violation of the by-laws of said Local 324 and Title I, § 101(a) (5) of the Labor Management Reporting and Disclosure Act. Plaintiff alleges that he was duly nominated and ran for the position of Business Agent of the Grand Rapids area office of defendant Local 324 in December of 1968, was overwhelmingly elected by the rank and file of the Grand Rapids area office and that notwithstanding this, he was arbitrarily, capriciously and wrongfully removed from his position of business representative because of his exercise of his right of dissent and freedom of speech guaranteed under the provisions of Title I of the Act.

Plaintiff seeks damages from defendant William J. Myers, then Business Manager of Local 324, and from the defendant Union, jointly and severally for his losses arising out of the alleged unlawful discharge; seeks restoration of pension fund payments and pension fund benefits; and restoration of his lawful and just position as business representative in charge of the Grand Rapids area office of defendant Local Union.

## FINDING OF FACTS

### BACKGROUND

Local Union 324 is an affiliate of the International Union of Operating Engineers whose charter provides hoisting and portable craft jurisdiction over the entire State of Michigan. The Local has a membership of approximately 11,000 operating engineers with its main office at Detroit, Michigan and six branch offices throughout the rest of the State at Grand Rapids, Flint, Battle Creek, Escanaba, Saginaw, and more recently, Traverse City. By way of illustration and not of definition, the membership by and large consists of the operators of heavy moving equipment such as bulldozers, cranes, and the like, used in the construction and general contracting industry.

The International Union is governed by a Constitution (plaintiff's exhibit 5), and subject to the Constitution, the Local Union is governed by detailed By-Laws (plaintiff's exhibit 6). Article XXIII of the Constitution provides for the government of the local unions and Sub-division I, Section (a) thereof provides in part as follows:

"The officers of a local union shall be the President, Vice President, Recording-Corresponding Secretary, Financial Secretary, Treasurer and three (3) Trustees."

The Constitution permits a local union to provide in its by-laws for a Business Manager, in which case he shall be elected and be an officer.

"The Business Manager shall be the chief executive officer of a Local Union. He shall appoint any and all representatives, agents and assistants, whose wages and allowances shall be determined as provided in the Local Union's by-laws. They shall work directly under his supervision. He may terminate them at any time. Should the Business Manager discharge any such employee, then said employee shall not be re-employed or paid by the Local Union in any capacity during the term of office of such Business Manager, unless his prior approval has been given. . . ."
Union Constitution, Art. XXIII, Sub-Div. 1, § (a)

Section 3 of Article VIII of the By-laws of the local describes the powers and duties of the local union Business Manager as follows:

"(a) The Business Manager shall be directly responsible to the membership of this local Union. He shall be authorized and empowered to direct and conduct the business affairs of the Local Union, at all times representing the entire membership. By virtue of his position, he shall have voice and vote on all matters before the Executive Board, and shall be a delegate to attend all conventions. He shall act as a member of the Board of Trustees of the Operating Engineers Health and Welfare Trust Fund and any other Funds created for the membership of this Local Union, and attend all the scheduled meetings therefor.

"(b) The Business Manager is authorized to employ and terminate all business representatives and assistants, and be responsible to the membership for their supervision and direction and the capable performances of their duties. He shall set the rate of pay of his assistants with approval of the Local Union.

"(c) He shall examine all applications for membership and submit same to Executive Board if he approves of same."

Some history of the internal affairs of the local, as shown by the proofs, is necessary in order to put the controversy here in its perspective. Prior to 1968, both Wheeler Witte and William J. Myers had served as Business Agents, appointed by the then Business Manager, Louis Blok. Each had been fired by Blok. Myers was fired on December 14, 1967 after having announced that "he was taking on his boss" in the up-coming elections for Business Manager. Witte himself was fired by Blok in July of 1968, presumably after Blok learned

that Witte and much of the membership in the Grand Rapids area had decided to support Myers' candidacy for Business Manager of the local.

In an effort to defeat the Blok administration and to "elect a clean slate in '68", a group of union members organized themselves into what they called the "United Rank and File" focusing their support upon the candidacy of Myers as Business Manager and upon a complete slate of other candidates for Union offices.

The 1200 union members in the Grand Rapids area and counties served by it had experienced substantial disaffection with the Local Union administration and also with its organization under the existing by-laws. Complaints particularly centered upon a belief that outstate interests were not being properly served by an administration which had its main office, and most of its membership, in the Detroit area. They also were especially concerned about the problems encountered in the Grand Rapids area in which a good deal of their competition for contracts was with non-union labor and non-union contractors and felt strongly that a training program concentrated in the western Michigan area would enable them to acquire additional skills in the operation of heavy equipment which would place them in a better competitive position. There was also a strong feeling among many of the members that the Grand Rapids area should enjoy a greater degree of autonomy. The proof is clear that Wheeler J. Witte enjoyed substantial personal prestige and respect among the union members in the Grand Rapids area and his long record of service in the labor movement over the years, together with his obvious personal ability and charm, make his popularity among the Grand Rapids area members entirely understandable.

The supporters of Myers and the rest of United Rank and File slate mounted a vigorous and effective campaign. Myers traveled extensively throughout the State and visited Grand Rapids on numerous occasions. The United Rank and File published a newspaper called the Equalizer (plaintiff's exhibits 2 and 3) which was distributed to the membership and carried to it the message of the group. The United Rank and File also distributed a slate card and platform (plaintiff's exhibit 1) which purported to represent the goals of the group. Three planks of that platform have been placed in issue here, as follows:

1. "Business Agents: We intend to let the members elect who *they* want to serve them in their area.

2. "District Government: At the Flint general membership meeting on July 10, we elected a 7-man Study Committee to investigate and report to the members their findings on District form government.

3. "Apprentice and re-training: A training program in *your* area designed to aid you and your family with more job opportunities."

Witte and the Grand Rapids area members were at first cautious in their support of the United Rank and File movement, but after several meetings with Myers and other members of it, decided to cast their lot with him. Thereafter they contributed their full and open support to the movement. It was successful and in August Myers and the rest of the slate were elected to their respective offices. On the same day that he took office, or perhaps one day later, Myers appointed Witte as Business Agent in charge of the Grand Rapids branch area and put him to work.

At least some disillusionment with the new administration on the part of the Grand Rapids area union members appeared almost immediately. It was the feeling of the Grand Rapids area union members that their confidence in the new administration had been betrayed by its failure promptly to implement the platform upon which it had run, particularly the three planks referred to. Witte found himself in the middle and thrown between the dissatisfaction of his union friends in the Grand Rapids area and his responsibility as Business

Agent to Myers and the administration. It is the history of this growing dispute between the Grand Rapids area union members and Myers which provides the background for this lawsuit.

A District Government Study Committee had been appointed following the promise for the same in the United Rank and File platform and a resolution (plaintiff's exhibit 4), drawn by Witte, had been presented to and also passed by the general membership of the Local in October, 1968. The resolution in brief was not for any permanent solution of the question of district government, but provided for continuing the Committee as a permanent research and advisory committee, in the meanwhile providing for the publication and mailing to each member of the Local a monthly local newspaper for the purpose of education and information. It also recommended unofficial monthly membership meetings in each branch office and rotation of the general membership meetings from area to area.

In addition thereto, the Grand Rapids area membership on November 29, 1968, at an area membership meeting, created a Membership Retraining Study Committee headed by Gerald C. Van Dellen as chairman. That committee immediately went to work attempting to organize a retraining and up-grading program for union members in the Grand Rapids area, seeking the approval of the leadership of Local 324. The resolution which sets forth the goals of the area membership is plaintiff's exhibit 7. By letter of December 7, 1968, addressed to the Executive Board of Local 324, Mr. Van Dellen sought an appointment for his committee to present the resolution personally to the Executive Board so that the committee could answer any questions pertaining to the resolution. Meanwhile, Mr. Van Dellen had contacted numerous contractors in the Grand Rapids area seeking their support for such a retraining program. He received in response a great deal of encouragement (see plaintiff's exhibit 12), but also ran directly into opposition from

Myers and from Hal Bell, the representative of the Michigan Chapter of the Association of General Contractors (AGC). This latter group consisted of general contractors in Michigan outside the four-county Detroit area and is the association which enters into collective bargaining with Local 324 on behalf of its members. Bell saw in the Grand Rapids activities a threat to the efforts already being made by a Joint Apprenticeship Committee (JAC), already created by Local 324 and the AGC to set up a restraining program to cover the needs for retraining and up-grading which existed throughout the entire out-state Michigan area. Mr. Bell, who had been a member of the JAC for about five years, strongly felt that any program should be under the sponsorship of the JAC. It was Bell's testimony that a retraining and up-grading program for members required adequate facilities and extremely expensive equipment and was a complicated and expensive matter. Bell feared that the Grand Rapids effort, however well-intentioned, would impair the broader program already under consideration. He quickly voiced his disapproval to Business Manager Myers. Myers himself was irked and at least in some way appeared to have held Witte responsible for the impasse to the extent that, according to Witte, Myers sometime after December 7, 1968, told him "Get those kooks off my back or you will lose your job."

Thereafter, tempers flared between the Grand Rapids Retraining Study Committee and Myers, particular when, on January 8, 1969, the committee traveled to Detroit to meet with the Executive Board of the Local only to find that no member of the Board had seen fit to keep the appointment. (Plaintiff's exhibit 9). An apology followed on behalf of the Executive Board (plaintiff's exhibit 11) and a new meeting was scheduled to be held on February 27, 1969.

Meanwhile Witte had been kept busy by Myers. Immediately following his appointment, Witte was sent to the Upper Peninsula of Michigan to assist

some new and inexperienced business agents there. He had worked on the District Government Study Committee. He had traveled to Cleveland, Ohio, where, with Myers on October 14, 1968, he attended a conference of the operating engineers in the Central States in order to work on a reciprocity agreement involving questions of marine contracting on the Great Lakes. He was called upon to work in the Detroit area on assignment from Myers on numerous occasions. He continued a follow-up on the problems in the Upper Peninsula. He was involved in contract negotiations in the Grand Rapids area, particularly those referred to as the Preston Tank contract and the Grand Rapids Gravel contracts. He spent a great deal of time in attempting to obtain recognition of Local 324 by the Kent County Road Commission employees. He was also involved in overseeing and attending to the problems of the union members in connection with the work on the huge power project under construction in Ludington and involving both Detroit Edison Company and Consumers Power Company.

Aside from the difficulty with the union members in the Grand Rapids area, several other incidents are given as forming a basis for Myers' final decision to fire Witte.

Witte submitted to Myers for payment the expenses of the committee members engaged in negotiating jointly with the Teamsters Union a contract with the Grand Rapids Gravel Company. Myers had previously cautioned Witte that he wished advance approval of any expenses incurred and this Witte neglected to do. Witte admitted that he should have checked with Myers first before incurring the expenses, but had failed to do so under the press of other work. It does not appear from the record how much expense is actually involved.

Witte transmitted to Myers an inquiry from the other business agents in Grand Rapids as to whether unemployment benefits could be drawn during vacation periods. Myers took offense at the suggestion.

Prior to Thanksgiving in 1968, Witte had talked to Myers about taking three days off on a Thanksgiving weekend to go deer hunting. Myers said, "We have just been elected. It's a hell of a time to go deer hunting." Shortly afterward, however, Myers permitted Witte to make the trip in view of the amount of work Witte had been putting in on behalf of the union.

It was Myers' testimony that at the time of the Cleveland meeting, Witte got "stoned out of a tree" at a private dinner party during the course of the sessions. Witte's testimony successfully challenged Myers' recollection as to the purpose of the Cleveland meeting and the date thereof (Myers had erroneously placed it in February, 1969), but offered no rebuttal to Myers' testimony concerning the specific conduct of which Myers complained.

Another factor was Myers' dissatisfaction with Witte's conduct in connection with the Kent County Road Commission election. According to the testimony, the Kent County Road Commission employees were at the time members of an unaffiliated association and it was the union's intention to garner sufficient support to force an election on representation. There were approximately 300 employees of the Road Commission and the Operating Engineers had obtained 90 signatures to the petition for election, well over the 30% required. At the final election, the Teamsters received 127 votes, the independent union 117 votes and Local 324 only 3 votes.

Joseph Valenti, President of Teamsters Local 214 in Detroit, testified extensively concerning his own union's efforts in the election. From Valenti's testimony, it is clear that the Teamsters' victory was the end product of a highly vigorous and resourceful campaign on the part of that union which contrasted

with the very minimal effort put forth on behalf of Local 324. Witte's explanation of the result is plausible. It was his claim that initial legal problems, uncertainty on the part of Myers and the administration of Local 324 as to whether to seek recognition for all employees, including female and clerical personnel, prevented any real campaign and action until only a few days before the election, by which time it was too late. This could very well be true, but true or not, it is apparent from the proofs that Myers cast the blame for the embarrassing showing upon Witte, to whom the task had originally been assigned. Myers was further embarrassed when Valenti, after the election but before February 28, openly gloated over the fact that he had made good on his promise that the Teamsters were going to take the election.

In the meanwhile, the difficulties in Grand Rapids had not subsided. One of the Board members, Roy Cromwell, of the Local, had died and all of the officers attended the funeral on February 27. That same evening, following the funeral, a heated meeting was held in Grand Rapids attended by a number of the members of the Executive Board as previously promised by Keith Sober as Recording and Corresponding Secretary of Local 324. (Plaintiff's exhibit 11). Minutes of that meeting are among the documents comprising plaintiff's exhibit 15.

The next day Witte met Myers in Lansing ostensibly to discuss with Myers certain matters about the Ludington project. Before Witte could get into the subject matter, Myers told Witte, "You're all done". When asked why by Witte, Myers replied, "It's better that way." Myers did at the same time promise to provide an additional week's pay for Witte. Upon his return to Grand Rapids, Witte found that the lock on the office had been changed and one week thereafter he was permitted to pick up his personal effects. This suit followed.

## FINDINGS OF FACT: REASONS FOR DISCHARGE

Turning now to the reasons for Witte's discharge by Myers, six basic reasons are given by defendants in justification as follows:

1. Witte submitted for payment expenses of certain members of a negotiating committee without having obtained prior approval for the expenditure, contrary to the express direction of the Business Manager.

2. Witte conducted himself in an improper way by being intoxicated at a dinner during the course of union business in Cleveland, Ohio.

3. Witte took three days off for deer hunting which was not within the vacation schedule established by Myers as Business Manager.

4. Witte sought to obtain unemployment benefits for the period in which his fellow business agents were supposedly to have been on vacation.

5. Witte's handling of Local 324's efforts to organize the employees of the Kent County Road Commission was unsatisfactory to Myers.

6. Witte failed or refused to support the position of the union leadership with respect to its overall retraining program as it was being developed by the Joint Apprenticeship Committee which had been established by the union and the Association of General Contractors.

Of the six reasons, as above stated, given for the discharge of Witte, it must be apparent that the first five did not involve the exercise of free speech or of a right protected by the statute. The reason encompassed in No. 6 above, it is contended, comes within the statute.

In this respect at least the case is not unlike Barbour v. Sheet Metal Workers International Association, 401 F.2d 152 (6th Cir. 1968) although that case involved the expulsion from the union of a member and required examination as well of the procedures for expulsion in the light of 29 U.S.C. § 411(a) (5).

It is appropriate to comment that two factors exist here which may have a bearing on this case and may at least to some extent distinguish it from others of apparently like nature. First, it must be remembered that Witte was not in any way expelled from the Union nor prevented from exercising any of his rights in his capacity as a regular Union member.

The second factor which would distinguish this case from at least some of the other cases examined is that although his appointment may have been ratified by vote, Witte was not in fact an elected officer of the Union, but was rather an employee of the Union, appointed by its Business Manager and subject to discharge by the Business Manager at his will. This is not a case where an official elected by the general membership is unilaterally discharged by the Union leadership. In such a case, the discharge may very well deny the membership effective union representation. While cases do not appear to make such a distinction, still as the case law interpreting the LMRDA develops, it is the opinion of the court that it would be unwise to conclude that under given circumstances, such a distinction could not be drawn.

The court understands from a reading of *Barbour*, supra, that the Sixth Circuit interpretation of the LMRDA provides that if the Union, in this case represented by its Business Manager Mr. Myers, was fully justified in discharging Witte for other valid reasons the inclusion in the original charges of a reason violative of the Act, does not vitiate the decision to discharge or expel, at least if it did not form a basis for the final decision. In such circumstances, however, it is obvious that a court must be particularly alert to ascertain from the facts in the case whether the other reasons given for the discharge have substance to them and to be most careful, lest those reasons are merely window dressing intended to obscure the real and proscribed motive. This obviously should not and cannot be done if the purposes of the Act are to be met. In this regard at least two of the reasons given appear to be in this category.

The most apparent of them is the letter written by Witte on behalf of his fellow business agents in Grand Rapids inquiring about unemployment benefits. The proofs showed that he was merely seeking on their behalf interpretation of a legal question to which he had no answer. Witte's testimony concerning that incident went unchallenged and satisfies the court that this incident did not in fact have any bearing on Witte's discharge.

The second incident in the same category is that of the deer hunting vacation. The court accepts as true Witte's unrebutted assertion that Myers himself after first refusing, subsequently privately advised Witte he could go in view of the hard work he put in, although Myers stated that he wished the issue had not been raised before the other agents as it was embarrassing to him. This again would appear to the court to have been a very minor matter and to have been so considered by Myers at the time. In view of Myers' own consent to the request, he can hardly say that Witte's conduct was justified or that it contributed to the ultimate decision.

The other grounds pose, however, much more difficulty. Myers, as duly elected Business Manager, was the local's chief executive officer. The membership of the Union, through its Constitution and By-laws, had entrusted to him the everyday direction of Union affairs and this necessarily included the supervision and discipline of Union employees. So important is the exercise of sound discretion by its chief executive to the effective operation of the Union and promotion of its policies that it ought not to be for a court to second-guess or to substitute its judgment for that of the man in whom the membership has placed its confidence by democratically electing him to assume that responsibility. Thus, it is not for this court to assess the wisdom of Mr. Myers' actions,

the propriety of alternate courses of action, or to determine whether in a given action he was right or wrong. Neither is it for this court to assess Mr. Myers' motives in so acting, unless those motives are ones which affect the protected rights of an employee under the statute as construed.

In the light of the foregoing, let us examine the remainder of the charges.

First, with respect to Witte's failure to obtain prior consent for incurring of expenses of the members of the negotiating committee, he himself acknowledged that he was in error and that he knew he should have obtained prior consent. The court is fully satisfied that this conduct was at the least disgruntling to Myers who in his own light was trying to achieve some degree of order and responsibility in the expenditure of Union funds. As understandable as Mr. Witte's reasons for neglecting to follow Myers' instructions may be, still this court is unable to see that Myers' reaction was unjustifiable or that it could not and did not form at least one legitimate basis for the ultimate decision to discharge Witte.

With respect to the incident in Cleveland, while Witte obviously showed himself to have a better recollection of the details of the meeting and the time in which it was actually held, he nevertheless did not himself testify or offer proof by others to refute Myers' claim that he was intoxicated on one occasion. While there was not a great deal of detail concerning the specific conduct, nevertheless it was most apparent to the court after listening to Myers' testimony, that his displeasure and disgust, whether justified or not, was real. Again, the court is unable to find that this ground was unjustified or unreasonable and is, in fact, satisfied that it constituted one of the genuine reasons for Myers' ultimate decision to discharge Witte.

The dissatisfaction of Myers with Witte's conduct of the attempts to or-ganize the employees of the Kent County Road Commission poses, on the face of it at least, more difficulty. It is apparent that Myers placed the blame for that embarrassing failure solely upon the shoulders of Witte and that under the facts as shown by the evidence, this may not have been entirely justified. The assignment of other work which necessarily took Witte away from the Grand Rapids area during the critical period of campaigning, Myers' failure personally to intervene in like manner as done by the Teamster President, the Union's difficulty in reaching a decision on the legal aspects of the election and vacillation of Mr. Myers and the Executive Board of the Union could very well be found to have been the principal reasons for the failure, if indeed it were the function of this court in this case to determine as a matter of fact what those reasons were. In truth, however, it is not. In the opinion of the court it is enough that Myers believed Witte to be responsible for that failure and the failure of a Business Agent to perform such a duty satisfactorily would be justifiable grounds for discharge. So long as the reason is not a sham and so long as the belief was genuinely held by Myers that Witte was responsible, we need go no further. The court is satisfied that Myers' genuine belief that Witte had not performed his job in connection with this matter formed a substantial basis for the ultimate decision to discharge him.

The last basis for discharge is the most sensitive one for it can be construed in fact as intended to deprive Witte of his right of free speech as guaranteed by 29 U.S.C. § 411(a)(2). It is, indeed, in this area in which a great deal of litigation and interpretation of the LMRDA can be anticipated.

The court at the outset dismisses the claim of Witte that his discharge was motivated by Witte's efforts along with members of the Grand Rapids area to obtain a district form of government or

other local autonomy. It is true that he did make this effort at least to the extent of contacting members of the International Union and of conferring with them. As a member of the Union in good standing, he certainly had every right to do so. The record, however, does not support any claim that this conduct had a bearing upon Witte's discharge. There is nothing to show that either Myers or any of the rest of the Union leadership interfered in any way with such rights.

The same cannot, however, be said of the dispute involving the effort of the Grand Rapids area Union members to obtain a retraining and up-grading program for their area unilaterally and without working through the Joint Apprenticeship Committee which had been established by the Union and the Association of General Contractors.

Although it may be considered a minority viewpoint upon the subject, the opinion of the United States Court of Appeals for the Fifth Circuit in Sewell v. Grand Lodge International Association of Machinists and Aerospace Workers, 445 F.2d 545 (5th Cir. 1971) ought to be given most careful consideration by anyone who is interested in an interpretation of the Act which recognizes both the rights of Union members and the necessity for a union to operate democratically, efficiently and effectively on behalf of all of its members. In this connection it must be remembered that the LMRDA was intended to protect democracy within labor unions, but not anarchy.

As indicated earlier, the testimony disclosed substantial dissatisfaction, especially in Grand Rapids, with Local 324's previous activities in retraining and up-grading the skills of its members. It is also apparent from the evidence that the Grand Rapids area Union members sought and thought they had from Myers a commitment for the local program they had in mind and that this formed an important basis for their support of him in the struggle for union leadership. It is apparent as well that they and Wheeler Witte were disappointed in Myers' attitude and apparent inaction after the latter took office. In Myers' defense, it can be observed that as so often happens, the view from the top is often much different from what it appeared before.

It is a valid inference from the evidence that upon taking office, Myers got more deeply involved in the plans that were already in progress for a training program to be organized on a state-wide basis and with the problems, particularly financial, which faced it. An immense amount of work had been done with obviously little to show for it at that time, but in Myers' eyes, progress was being made and he conceived it to be a legitimate object of the Union to pursue the program through the Joint Apprenticeship Committee already in existence. From Myers' point of view, he conceived that he had a right to promote the broader program then developing as a legitimate policy of the Union and to insist that the Business Agents whom he appointed to cover all geographical areas of the State work affirmatively in support of that program. In Myers' eyes, Witte did not do so. In his eyes at least, the activities of the Grand Rapids area were seriously impairing the success of the overall program in by-passing the Joint Apprenticeship Committee, and going directly to the individual members of the Association of General Contractors for support. These would be the same contractors whose support was vital to the overall programs. While the contractors were most willing to work and to contribute toward retraining and up-grading of the skills of Union members, still because of the expense involved, they might not be so willing, however, to contribute to competing or overlapping programs. Because he was experienced, and because he enjoyed a great rapport with the Grand Rapids area Union members, Witte was expected by Myers to car-

ry to the Grand Rapids members the message of the leadership of Local 324 and to assist actually in ironing out the difficulties which existed to the end that the overall policy of the Union would not be impaired. In Myers' eyes at least, Witte did not do so and it is Witte's alleged conduct in this regard which forms the basis for his claim that he was denied the rights of exercise of free speech and expression of ideas guaranteed to him under LMRDA.

Nearly all of the activities of a business agent such as Mr. Witte are necessarily going to involve communication, written or oral, and if it were to be held that all such communications are a protected exercise of free speech, then it must logically follow that the chief executive of the Union would thereby be barred from any effective control over his business agents and in consequence would be barred from effectively administering his office and promoting the legitimate policies of the Union as a whole. The court cannot conceive that this was one of the aims of the LMRDA.

■ In conclusion, the court finds that Mr. Myers' dissatisfaction with Witte's failure to cooperate in the overall program for state-wide retraining and with Witte's failure to iron out the difficulties which existed in Grand Rapids constituted in fact important reasons contributing to Witte's ultimate discharge. The court likewise finds that these reasons were within the legitimate exercise of his discretion by Myers and, considered with the other stated reasons for his discharge, do not constitute such violations of Mr. Witte's rights under the Act as to entitle Mr. Witte to reinstatement as Business Agent and to damages for his discharge.

## CONCLUSIONS OF LAW

1. This case presents assertions of a substantial claim under the Labor Management Reporting and Disclosure Act which under the provisions of 29 U.S.C.

§ 412, gives this court jurisdiction over the claim.

■ 2. There being a total absence of any showing that the defendant William J. Myers was at any time acting in bad faith or beyond the scope of his authority as duly elected Business Manager of Local 324, there can be no personal liability on his part, Gulickson v. Forest, 290 F.Supp. 457 (DCNY 1968).

■ 3. Witte was discharged as Business Agent by William J. Myers pursuant to the latter's authority given him by virtue of the Constitution of the International Union and the By-laws of Local 324. Witte, as such Business Agent, was not an elected union official within the common meaning of that term, notwithstanding the fact that his appointment may have been ratified by the membership, since any such ratification was not necessary and must therefore be deemed surplusage. Myers' summary discharge of Witte was within the powers granted to him by the Constitution of the International Union and By-laws of the local union, unless those powers are limited by any applicable provision of the LMRDA.

■ 4. The provisions of Section 101(a) (5) of the LMRDA, U.S.C.A. § 411(a) (5), providing that:

"No member of any labor organization may be fined, suspended, expelled or otherwise disciplined  .   .   .   .   . unless such member has been

(A) served with written specific charges;

(B) given a reasonable time to prepare his defense;

(C) afforded a full and fair hearing."

do not preclude the summary removal of a union member from a union office or employment, Grand Lodge International Association of Machinists v. King, 335 F.2d 340 (9th Cir. 1964) cert. denied

379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334; Airline Stewards and Stewardesses Ass'n. v. Transport Workers Union, 334 F.2d 805 (7th Cir. 1964) cert. denied, 379 U.S. 972, 85 S.Ct. 648, 13 L.Ed.2d 563; DeCampli v. Greeley, 293 F.Supp. 746 (D.C.N.J.1968).

■ 5. The greater weight of authority supports that construction of LMRDA which holds that the rights guaranteed under 29 U.S.C. § 411, and particularly the rights to free speech under 29 U.S.C. § 412, extend to union members not only in their capacity as such members, but generally in their capacity as officials or employees of the union, see *Grand Lodge, DeCampli* and *Gulickson,* supra.

To the contrary, perhaps under distinguishing facts, see Suel v. Machinists, supra. On appeal, the United States Court of Appeals, 5th Circuit, affirmed the District Court decision, but modified the reasons therefor, Suel v. Machinists, decided July 7, 1971, United States Court of Appeals, 5th Cir., 77 LLRM 2916. See also Sheridan v. United Brotherhood of Carpenters and Joiners of America, 306 F.2d 152 (3rd Cir. 1962).

■ 6. It is not for a District Court, acting under the jurisdiction conferred upon it by LMRDA, to weigh and evaluate the reasons for the discharge of a union member, other than to determine whether the discharge was wrongful because it was occasioned by the exercise of rights protected under the Act. This is usually a question of fact to be determined by the trial judge in the light of all of the facts and circumstances surrounding the discharge.

7. The discharge of Wheeler J. Witte as Business Agent of Local 324 did not violate any rights protected under LMRDA.

Accordingly, judgment in favor of defendants for no cause of action will enter.