NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL UNION OF OPERAT-
ING ENGINEERS, LOCAL 18,
AFL–CIO, Respondent.

No. 73–1760.

United States Court of Appeals,
Sixth Circuit.

Argued April 12, 1977.

Decided and Filed May 10, 1977.

Louis S. Belkin, Alan S. Belkin, Belkin &
Belkin, Jeffrey A. Belkin, Thomas C. Liber,
Cleveland, Ohio, for petitioner.

Elliott Moore, Deputy Associate Gen.
Counsel, Peter G. Nash, John S. Irving, Jr.,
Patrick H. Hardin, Robert A. Giannasi,
David Miller, Stuart Rosenblum, Paul J.
Spielberg, Richard A. Cohen, Washington,
D. C., for respondent.

Before PHILLIPS, Chief Judge, and ED-
WARDS and LIVELY, Circuit Judges.

PER CURIAM.

This case is before the court for the
second time. In its first decision the Board
found that the union had violated § 8(b)(2)
and (b)(1)(A) of the National Labor Rela-
tions Act, as amended, 29 U.S.C. § 158(b)(2)
and (b)(1)(A) (1970), by interfering with the
employment rights of one of its members,
William F. Murphy, because of his conduct
in attempting to disrupt a union election.[1]
The hearing officer in the first case had
denied the union the opportunity to show
by testimony the nature of Murphy's mis-
conduct on the ground that Board policy
prohibited any interference with a union
member's employment rights. This court
read *Philadelphia Typographical Union,
Local No. 2*, 189 N.L.R.B. 829 (1971), as
creating an exception to that rule, vacated
the Board's order and remanded for rehear-
ing, including inquiry into the nature of
Murphy's misconduct, and for reconsidera-
tion under the standards of *Philadelphia
Typographical Union*.[2] The Board's brief
accurately portrays the episode which led to
the union's charges against Murphy:

"*Murphy's conduct during the election*

The incident which precipitated the
Union's disciplinary action against Mur-
phy occurred in connection with an intra-
union election for delegates to the Un-
ion's International convention. The Un-
ion, with some 15,000 members, was to
elect delegates to the convention from
each of its six districts. Murphy was a
candidate for delegate from District I.

1. *International Union of Operating Engineers,
Local 18*, 204 N.L.R.B. 681 (1973).

2. *International Union of Operating Engineers,
Local 18 v. NLRB*, 496 F.2d 1308 (6th Cir.
1974).

An election committee had contracted with the Honest Ballot Association (herein the "HBA") for services which included the preparation, mailing and tallying of ballots. To insure the accuracy and secrecy of the balloting, HBA's Executive Director George Abrams prepared a "control list" of qualified voters.[6]

6. The list included the name and address of each union member, information furnished by the election committee. Each name on the list was assigned a "control number" by the HBA. The "control number" was also placed on the outer return envelope, and each member was instructed to sign the envelope before mailing his ballot to the HBA. The staff of the HBA retained custody of the control list at all times and neither the Union officials nor the candidates were permitted access to it.

On February 12, the members of the election committee and some of the candidates for delegate (including Murphy) gathered at the Union Hall where the ballots were to be tallied by Abrams and his staff. The HBA's first step was to check the signatures and control numbers on the outer envelopes against the control list and to segregate them according to district. Then, after the challenged ballots were identified, the outer envelopes were removed from all non-challenged ballots, and the control list, no longer needed for the tally, was placed upon a table located in an area which Election Committee Chairman Stanley Blair declared off limits to all but the election committee and the HBA staff. At this point, the actual tallying of ballots began.

About 3 p. m., when the tally was about half completed, Abrams looked up and saw Murphy enter the restricted area, pick up the control list and start to exit from the room. Abrams called out to Blair, "Mr. Murphy is running off with the list." Thereupon, Abrams, Blair and several others began a pursuit of Murphy which led them up the stairs of the Union hall to street level, through the street and, finally, up the stairs of a nearby building which housed a restaurant. Soon after the chase began, one of the pursuers, Union Business Agent Bowles, was about to overtake Murphy, when the latter turned and kicked him. As Murphy approached the street, someone shouted "Stop him, stop, stop him, the son-of-a-bitch." When he reached the second floor of the restaurant, Murphy found a locked door and slid the control list under the door. The police were then summoned and Murphy was placed under arrest.[7] Although Murphy refused to

7. The charges against Murphy were eventually dismissed.

say what he had done with the control list, it was recovered after about 30 minutes. Abrams and Union officials then returned to the union hall and the tally of ballots was completed without further incident.

The HBA did not bill the Union for any additional charges based on the incident, nor did the incident inspire challenges to the election. The loss of the control list would not have prevented the HBA from completing the tally of ballots and certifying the election results. The only possible need for the list would have been in connection with an investigation of the election by the Department of Labor; in that case, the HBA could have reproduced the control list."

One other fact should be added to this recital. The Administrative Law Judge who heard this case found that Murphy's sliding the control list under the locked door was sabotage.

In spite of this finding of fact, the ALJ recommended that the Board reaffirm its original holding that the union violated § 8(b)(2) and (b)(1)(A) by unlawfully diminishing Murphy's job referral seniority. The Board affirmed without further comment. The ALJ appeared to distinguish *Philadelphia Typographical Union* where the union officer was found guilty of embezzling $35,000 from the union treasury and lost his seniority and was laid off as a result thereof, by finding that "the peculation of a dishonest treasurer could well have destroyed the ability of the union to serve its membership."[3] We do not find a significant effort to sabo-

3. *International Union of Operating Engineers, Local 18,* 220 N.L.R.B. 147, 150 (1975).

tage a union election to be a less important interference with the lawful functioning of the union. So long as the Board adheres to its *Philadelphia Typographical Union* decision, we feel it must administer it consistently and that the rationale of the case requires our denial of the instant petition for enforcement.

Enforcement denied.