William F. **MURPHY**, Plaintiff-Appellee, Cross-Appellant,

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18; John Possehl; Charles Rutherford; John Frank; Frank Miller; and S.A. Blair, Defendants-Appellants, Cross-Appellees.**

Nos. 82–3702, 82–3747.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 14, 1985.

Decided Sept. 30, 1985.

William Fadel, Cleveland, Ohio, Bernard M. Baum, argued, Baum, Sigman & Gold, Chicago, Ill., for defendants-appellants, cross-appellees.

Alan Miles Ruben, argued, Cleveland-Marshall College of Law, Cleveland State

University, Cleveland, Ohio, for plaintiff-appellee, cross-appellant.

Before ENGEL and JONES, Circuit Judges, and SPIEGEL, District Judge.*

ENGEL, Circuit Judge.

This case represents the latest and, it might be hoped, the last of extensive litigation dating from 1973 and involving an intraunion conflict for control of Local 18 of the International Union of Operating Engineers. This litigation, brought by William F. Murphy, was first commenced on December 21, 1973. Murphy's continuing conflict with Local 18 has already been before this court twice. *International Union of Operating Engineers, Local 18 v. NLRB*, 496 F.2d 1308 (6th Cir.1974); *NLRB v. International Union of Operating Engineers, Local 18*, 555 F.2d 552 (6th Cir.1977). The closely allied disputes involving dissident union members John, Ervin, William, and Walter Shimman and their supporters have spawned an even greater flow of litigation. The intraunion conflicts within the International Union of Operating Engineers have also been a specific concern of Congress as it considered the adequacy of federal labor law as it affects union democracy. Interim Report, Select Committee on Improper Activities in the Labor or Management Field, S.Rep. No. 1417, 85th Cong., 2d Sess. 371–443 (1958); *see also Nelson v. Johnson,* 212 F.Supp. 233, 265 (D.Minn.), *aff'd,* 325 F.2d 646 (8th Cir.1963). The detailed facts are to be found in the extensive record in this appeal and in nearly two hundred pages of findings of fact and conclusions of law made by United States District Judge Thomas D. Lambros. The district court's opinion is reported at *Murphy v. International Union of Operating Engineers, Local 18 et al.,* 99 L.R.R.M. 2074 (N.D.Ohio 1978).

The result of our careful review of this extensive record is to uphold in nearly all respects the judgment entered by Judge Lambros. The departure we take from his conclusions in certain instances reflect, in the main, changes or refinements in the law which have taken place since particular rulings were made. On the whole, however, Judge Lambros has by prodigious and careful work fulfilled a highly difficult task with skill, intelligence and care. We commend him for it.

The International Union of Operating Engineers, Local 18 ("Local 18" or the "Union") and John Frank appeal [1] and William F. Murphy cross-appeals from the judgment entered in the United States District Court for the Northern District of Ohio in this labor dispute. Appellants contend that the district court erroneously found violations of section 411 of the Labor-Management Reporting and Disclosure Act ("LMRDA") (or "Landrum-Griffin Act"), 29 U.S.C. §§ 401–531; 42 U.S.C. § 1985(3); section 301 of the Labor-Management Relations Act, ("LMRA"), 29 U.S.C. § 185; and various pendent state law claims. Murphy argues that the district court should not have vacated its punitive damages award, should have taxed his expert witness fees as costs, and should have found in his favor on one additional count under section 411.

## I. THE FACTS

Local 18 is the collective bargaining representative for approximately 16,000 members who operate and maintain heavy equipment in the construction industry in eighty-five counties in Ohio and four counties in Kentucky. Local 18 is directed by a Business Manager, thirteen other elected officers, and its Executive Board. The Executive Board is comprised of the Business Manager and five of the Union's other

---

* Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

1. While the appellants' notice of appeal states that "each and every defendant" named in the suit appeals, the district court entered judgment against only Local 18, John Frank, and John Possehl. The district court later vacated all awards against Possehl because he died before judgment was entered and the court considered the judgment against him personal in nature. Therefore, only Local 18 and Frank are involved in this appeal.

elected officers as well as three elected members from each of Local 18's six administrative districts. Each of these six districts is under the direction of a District Representative, who is assisted by Business Agents and clerical employees, all of whom serve at the Business Manager's discretion.

During the period in question here, John Possehl was Local 18's Business Manager, and John Frank was both Vice-President of Local 18 and Business Agent of District One in Cleveland (from 1962 to 1968) and District Two in Toledo (after 1968).

The Union operates an exclusive hiring hall under a variety of collective bargaining agreements to which it is a party. Under the Union's employment referral system, each member who is seeking employment registers in a district's work referral deck. A member may only be registered in one deck at any time. Referrals are then made on the basis of the member's seniority as an operating engineer and the length of time his card has been in the deck.

Murphy was a Local 18 member who was within District One's jurisdiction. The district court found that Murphy had been associated with the "dissident movement" within Local 18 since 1970. In his lawsuit Murphy claimed that the Union discriminated against the dissidents as class in decision-making work referrals, and access to Union publications. He presented evidence that because of his opposition to the leadership, he was intimidated and subjected to violence, deprived of job referrals, denied a full and fair disciplinary hearing before Local 18's membership, unfairly rejected for reinstatement to the membership, and otherwise deprived of his rights as a Local 18 member. Murphy claimed that these actions were the result of a conspiracy among the Local 18 leaders named as defendants in his suit below.

Specifically, Murphy proved that the Union manipulated its work referral system to deny dissidents, including Murphy, employment opportunities. The number of days Murphy was employed through the Union declined from more than 200 days per year before 1970 (when he joined the dissident movement) to less than 100 days per year after 1970. Other Local 18 members who were not considered dissidents did not suffer equivalent declines in employment.

In addition, the district court found that the Local 18 leadership used verbal and physical harassment to control the dissidents.[2] Murphy alleged and proved that he was twice physically attacked by agents of Local 18's leadership: on June 27, 1970, he was beaten by two District Two Executive Board members (James Grothaus and Kenneth Delaney) after an Executive Board meeting, and on January 23, 1972, he was knocked unconscious by two District Three members (Raymond Eugene Shell and A.J. Roberts) while passing out dissident literature before a statewide Local 18 meeting.

Finally, Murphy established that the Union improperly disciplined him for his alleged theft of an election control list. Murphy was charged with the theft and tried before the District One membership, as required by Local 18's constitution and bylaws. The membership voted to convict him, and he was suspended for two years. In the district court Murphy proved that the District One leadership arranged to have members from other districts attend the meeting at which his disciplinary hearing was held in order to ensure his conviction. Murphy also established that as additional punishment for his conviction, the District One leadership removed his work referral card from its referral deck and refused to reregister the card, even though the removal was not a punishment which had been imposed at his hearing. More-

2. Extensive facts relative to the Shimmans who, like Murphy, were dissidents are chronicled in the cases reporting decisions involving the Shimman brothers. *See International Union of Operating Engineers, Local 18, AFL–CIO (C.F. Braun Co.) and Walter Shimman, et al.,* 1973 NLRB Dec. (CCH) ¶ 25,745 (August 27, 1973); *NLRB v. International Union of Operating Engineers, Local 18,* 500 F.2d 48 (6th Cir.1974); *Shimman v. Frank,* 625 F.2d 80 (6th Cir.1980); *Shimman v. Frank,* 633 F.2d 468 (6th Cir.1980); *Shimman v. International Union of Operating Engineers, Local 18,* 744 F.2d 1226 (6th Cir. 1984).

over, Murphy showed that after his two-year suspension had ended, the Union refused to reinstate him as a member.

## II. THE ACTION

On December 21, 1973, Murphy filed this action in the United States District Court for the Northern District of Ohio, alleging violations of the LMRDA, 29 U.S.C. §§ 411, 412. During and at the close of the bench trial, Murphy amended his complaint to add claims under 42 U.S.C. §§ 1981 and 1985(3), as well as other sections of the LMRDA (29 U.S.C. §§ 481(c), 501, 523, 529, and 530), 29 U.S.C. § 185, and a number of pendent claims. Named as defendants were Local 18, John Possehl, John Frank, Charles Rutherford (Local 18 President), Frank Miller (a District One officer), and S.A. Blair (a Local 18 officer).

On July 18, 1978, Judge Lambros entered judgment in Murphy's favor against Local 18, Possehl, and Frank under 29 U.S.C. §§ 411, 412, and 529; 29 U.S.C. § 185 (against Local 18 only); and 42 U.S.C. § 1985(3). He also found in Murphy's favor on state law claims of breach of implied contract (against Local 18 only), breach of fiduciary duty (against Possehl only), assault and battery, and conspiracy. Judge Lambros entered judgment on all counts in favor of defendants Rutherford, Miller, and Blair. *Murphy v. International Union of Operating Engineers, Local 18, et al.,* 99 L.R.R.M. 2074 (N.D.Ohio 1978) (hereinafter "Dist. Ct. op.").

The court found Local 18, Possehl, and Frank jointly liable for compensatory damages for Murphy's lost wages and benefits (in an amount to be determined) and $10,-000 for pain and suffering. It also awarded Murphy punitive damages in the amount of $30,000 against Possehl, $20,000 against Frank, and $150,000 against Local 18. However, because Possehl had died before judgment was entered, the district court vacated the award of all damages against him. The court also granted Murphy in-

junctive relief, requiring the Union to cease discrimination against him in its work referral system, to allow him to exercise his right to participate in Union activities, and to expunge its records of all entries concerning his disciplinary hearing and conviction. Moreover, the court ordered measures to make the Union's work referral system operate more fairly.

On October 14, 1982, Judge Lambros issued a Post-Judgment Memorandum Opinion and Order in which he vacated the punitive damage awards against Frank and Local 18. *Murphy v. International Union of Operating Engineers, Local 18, et al.,* No. C73–1336, post-judgment memorandum opinion and order (N.D.Ohio October 14, 1982) (hereinafter "Dist.Ct. post-judgment order"). The award against Frank was vacated because he agreed not to seek or hold any Union office for five years. The award against Local 18 was vacated because the Union submitted a plan to make its decision-making and referral processes more democratic. The court then adopted the Union's plan as part of its injunctive relief. In the October 14 order Judge Lambros also awarded Murphy $133,340 in attorneys' fees. However, he refused to tax as costs the fees of two experts whose testimony Murphy offered to prove the amount of his lost wages and discrimination in employment referrals. This appeal and cross-appeal followed.

On appeal, the Union[3] contends that the district court erroneously found the statutory and common law violations in question. The Union also argues that attorneys' fees should not have been awarded and that their amount was excessive. In his cross-appeal, Murphy claims that the district court should not have vacated its award of punitive damages and should have assessed his expert witness fees as costs. Murphy also asserts that the district court should have found the Union's refusal to provide the dissidents access to

---

**3.** In the discussion that follows the term "Union" includes both appellants, namely, Local 18 and John Frank.

the Union newspaper improper under 29 U.S.C. § 411.

## III. THE SECTION 411 LANDRUM–GRIFFIN ACT CLAIMS

Title I of the Labor-Management Reporting and Disclosure Act (also known as the Landrum-Griffin Act), 29 U.S.C. §§ 411–15, provides a number of protections for union members.[4] The Landrum-Griffin Act was "primarily intended to correct the abuses which have crept into the labor and management field ..." H.R.Rep. No. 741, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Ad.News 2318, 2424. Congress found that "it is essential that

4. Section 411 provides:

**§ 411. Bill of rights; constitution and bylaws of labor organizations**

(a)(1) **Equal rights.**—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) **Freedom of speech and assembly.**—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

(3) **Dues, initiation fees, and assessments.**—Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or

(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization: *Provided,* That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization.

(4) **Protection of the right to sue.**—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further,* That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

(5) **Safeguards against improper disciplinary action.**—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

(b) Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.

92 U.S.C. § 411.

union practices and procedures be democratic and that they recognize and protect the basic rights of the union members and the employees represented by unions." H.R.Rep. No. 741, *supra*, at 2429. The "Bill of Rights" sections of the Act contained in Title I guarantee members, among other protections, equal rights to vote and otherwise participate in union deliberations, 29 U.S.C. § 411(a)(1), as well as the rights of free speech and assembly, 29 U.S.C. § 411(a)(2). Section 411(a)(5) also protects union members from being "fined, suspended, expelled or otherwise disciplined except for nonpayment of dues" without a full and fair hearing. Section 529 of the Act, 29 U.S.C. § 529, further provides that members may not be disciplined for exercising their rights under the Act. Each of these rights may be enforced in a civil action in a district court. 29 U.S.C. § 412.

### A. Manipulation of the Union Referral System

Murphy alleged and Judge Lambros found that the Local 18 leadership had manipulated its job referral system to deny Murphy work. Local 18 is an exclusive hiring hall which makes job assignments through the use of cards in a work referral deck. Ordinarily, members who are qualified for a job and whose cards have been in the deck for the longest period of time are the first offered work assignments when they come into the office. However, Judge Lambros found that the District One leadership had manipulated the employment referral system to benefit their supporters and punish dissidents and that Murphy had experienced a great decrease in his average annual employment because of his dissident activities. Judge Lambros held that even though the Union had improperly discriminated against Murphy in administering its job referral system, those acts did not constitute "discipline" under either section 411(a)(5) or section 529. He did, however, characterize the acts as "economic discrimination" violative of Murphy's equal rights and right to free speech protected under sections 411(a)(1) and (2). The Union

claims that under *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), the claimed conduct is not actionable under section 411.

Under section 411(a)(5) and section 529 of the Landrum-Griffin Act, a union may not discipline a member without observing certain procedural due process safeguards, including providing a full and fair hearing. 29 U.S.C. § 411(a)(5); 29 U.S.C. § 529. Before the Supreme Court decided *Finnegan v. Leu*, the Second Circuit had held that the term "discipline," as used in the Act, "must include something more than the usual forms of union discipline—fines, suspension, or expulsions—which are expressly mentioned [in the Act. The term] extends as far as 'blacklisting' or certain other union actions that interfere with a worker's employment opportunities." *Morrissey v. National Maritime Union of America*, 544 F.2d 19, 26 (2d Cir.1976). In *Detroy v. American Guild of Variety Artists*, 286 F.2d 75 (2d Cir.), *cert. denied*, 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961), the Second Circuit held that the union's listing of a member on an "Unfair List," which "virtually barred [plaintiff] from employment by those dealing regularly with the [union]," constituted discipline within the meaning of section 411(a)(5). *Id.* at 79–81.

In *Figueroa v. National Maritime Union of America*, 342 F.2d 400, 406 (2d Cir.1965), the Second Circuit, while reaffirming *Detroy*, held that no "discipline" took place where the union's refusal to refer members to jobs was obedient to the employers' wishes as embodied in a collective bargaining agreement. There the court found that

the refusal to register and refer was pursuant to the terms of a collective bargaining agreement and in compliance with the declared policy of the shipowners that they will hire no seaman known to have a narcotics conviction. This was no more "discipline," once appellees admitted their convictions and the applicability to them of the terms of the collective bargaining agreement, than it would have been to turn down an appli-

cant who admitted that he lacked a physical requirement for the job or who admitted that he fell outside the age limits specified by the employer.

*Id.* Thus, the court concluded that because such acts did not constitute "discipline," the plaintiffs' section 411(a)(5) rights were not violated when they were denied a hearing. *Id.*

Plainly, it cannot be argued the Union's discrimination against Murphy was pursuant to employers' wishes embodied in a collective bargaining agreement. *Figueroa* is, therefore, not on point and the facts here are more akin to those in *Detroy.* Thus, if we follow the Second Circuit, the Union's actions in manipulating the referral system to deny Murphy work can be considered "discipline" for which Murphy should at least have first received a hearing.[5]

In one significant aspect, however, the Second Circuit cases may be distinguished. The employment-related sanctions imposed in those cases totally foreclosed the plaintiffs' employment opportunities while it appears here that the work referral system was manipulated merely to *lessen* Murphy's chances of being referred to a job. Because Judge Lambros also held that the Union's actions in removing Murphy's work

card from the work referral deck (and thereby totally foreclosing employment through the Union) did constitute "discipline," this difference seems to have been significant to the district court. Judge Lambros' conclusion that mere unsystematic manipulation, as opposed to a total foreclosure of such job referrals, may not constitute "discipline" thus represents a cautions approach to section 411.

■ Even though Judge Lambros held that the Union's actions with regard to the referral system were not "discipline," he still found that those actions were redressable under section 412 as a violation of Murphy's section 411(a)(2) right to free speech and section 411(a)(1) equal rights, because the Union was attempting to suppress Murphy's participation in Union activities. Judge Lambros thus correctly recognized that a suit may be brought to redress an infringement of section 411 rights even if no improper "discipline" is shown. *Finnegan v. Leu,* 456 U.S. at 439, 102 S.Ct. at 1872; *Cehaich v. Inter. Union, UAW,* 710 F.2d 234, 238 (6th Cir.1983).

Relying on *Finnegan,* however, the Union argues that the "economic discrimination" alleged by Murphy did not infringe his section 411(a)(1) and (2) rights. In *Fin-*

---

**5.** The Union asserts that *Finnegan v. Leu* may have implicitly overruled *Detroy.* In *Finnegan v. Leu,* the Supreme Court held that discharge from appointive union employment is not "discipline" within the meaning of section 529 or section 411(a)(5). 456 U.S. at 438–39, 102 S.Ct. at 1871–72. The Court concluded that "the term 'discipline' ... refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union. [The term was] meant to refer only to punitive actions diminishing membership rights." *Id.* at 437–38, 102 S.Ct. at 1871 (emphasis in original). In our view, *Finnegan* is plainly distinguishable because the plaintiff there was an appointed employee of the union itself, and the Court stressed the importance of allowing "an elected union leader to chose a staff whose views are compatible with his own," *id.* at 441, 102 S.Ct. at 1873 (footnote omitted). This represents a view anticipated by the writer in *Witte v. Myers,* 343 F.Supp. 873, 883 (W.D.Mich.1971).

Two subsequent court of appeals decisions dealing with "benching" apply *Finnegan* to union actions affecting outside employment.

*Turner v. Local Lodge No. 455, etc.,* 755 F.2d 866 (11th Cir.1985); *Hackenburg v. International Brotherhood of Boilermakers, etc.,* 694 F.2d 1237 (10th Cir.1982). However, those decisions may be distinguished from the instant case because the unions there acted pursuant to valid collective bargaining agreements and did not intend to suppress any section 411 rights.

*Miller v. Holden,* 535 F.2d 912 (5th Cir.1976), a pre-*Finnegan* decision by the Fifth Circuit holding that the union's alleged inducement of plaintiff's discharge from employment with a union-affiliated trust did not constitute discipline, is also distinguishable. In *Miller,* the court specifically noted that the employment in question was totally unrelated to union member status: "Our opinion today ... demonstrates that a discharge from employment represents discipline only when the member's employment status is a function of some internal union status, *such as a hiring hall* or, conversely, a union blacklist." *Id.* at 915 (emphasis added). Here the Union operated an exclusive hiring hall, and *Miller's* holding concerning discipline thus clearly not on point.

*negan*, the Supreme Court held that a union leader's discharge of a union employee because of the employee's support of a losing candidate for union office was at most an "indirect interference" with the exercise of the employee's membership rights. The Court found that this indirect inference with the rights of free speech and free participation in union deliberations did not amount to a violation of section 411(a)(1) or (2). 456 U.S. at 440–42, 102 S.Ct. at 1872–73. The Union contends that its acts here are at most such an "indirect interference," not actionable under section 411(a)(1) or (2).

We believe the Union's reading of *Finnegan* is overbroad. In *Finnegan*, the Supreme Court was clearly concerned about a union leader's right to choose people to help him run the union:

> [The Landrum-Griffin Act] does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own. Indeed, neither the language nor the legislative history of the Act suggests that it was intended even to address the issue of union patronage....
>
> ... Nothing in the Act evinces a Congressional intent to alter the traditional pattern which would permit a union president under these circumstances to appoint agents of his choice to carry out his policies....
>
> ... Rather, its concerns were with promoting union democracy, and protecting the rights of union *members* from arbitrary action by the union or its officers.

456 U.S. at 441–42, 102 S.Ct. at 1873 (footnotes omitted) (emphasis in original). *See also Witte v. Myers*, 343 F.Supp. 873, 883 (W.D.Mich.1971), in which this writer held that "[t]he provisions of ... the LMRDA, U.S.C.A. § 411(a)(5) ... do not preclude the summary removal of a union member from a union office or employment." The *Finnegan* decision dealt only with union employees involved with decision-making at

the union management level; it left open whether the decision applies even to "non-policymaking and nonconfidential employees" of the union itself. 456 U.S. at 441 n. 11, 102 S.Ct. at 1873 n. 11.[6] Plainly, the Supreme Court in *Finnegan* did not intend to rule out section 411 as a protection against manipulative discrimination on behalf of an ordinary union member seeking to exercise his right of expression at union meetings.

■ Therefore, the Union's argument here must fail. The "economic discrimination" involved in manipulating a work referral system to discriminate against a member because of his exercise of his section 411 rights is, in our view, actionable, and Judge Lambros properly found such a violation here. *See Miller v. Holden*, 535 F.2d 912, 915–16 (5th Cir.1976).

### B. Refusal to Reregister Work Card

The Union again relies on *Finnegan v. Leu*, 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), to argue that Judge Lambros erroneously found that the Union had "disciplined" Murphy without the due process guaranteed by section 411(a)(5) when it removed Murphy's work card from the work referral deck after he was suspended for theft of an election control list. The punishment formally imposed for that theft did not include such removal. The Union contends that the removal was "employment-related" and did not affect Murphy's rights as a union member to engage in union politics, and that Murphy was, therefore, not entitled to the procedural protections of the LMRDA. We disagree.

■ The Union's action in foreclosing Murphy's participation in the work referral program was a sanction which set him apart from other members in good standing. It unquestionably affected his membership rights. Judge Lambros correctly held that the removal of the card was disci-

---

**6.** The special concurrence of Justice Blackmun, with whom Justice Brennan joined, also stressed that the majority opinion in *Finnegan* should not necessarily be read to allow a newly elected union leader to retaliate against all union member-employees who opposed his candidacy. *Finnegan v. Leu*, 456 U.S. at 442–43, 102 S.Ct. at 1873–74 (Blackmun, J., concurring).

pline impermissibly imposed without a full and fair hearing.

### C. Partiality in the Disciplinary Hearing

Judge Lambros determined that Murphy was denied a full and fair hearing on the charges that he stole the election list. The court found that members of Local 18's other districts had been brought in by the District One leadership to vote against Murphy in the disciplinary proceedings. Such manipulation of the tribunal's composition, Judge Lambros held, totally tainted the proceedings. The Union contends that only the testimony of Kenneth Delaney, a District Two Executive Board member and an admitted perjurer, supports the conclusion that members of other districts were brought in to convict Murphy. The Union further argues that even if Delaney's testimony proves that he at least had been told to attend the meeting and vote against Murphy, section 411(a)(5) was not violated.

29 U.S.C. § 411(a)(5) provides that a union member may not be disciplined by the union unless he has been "afforded a full and fair hearing." The Sixth Circuit has construed "this to mean that traditional concepts of due process should apply" to union disciplinary hearings, including the right to an impartial tribunal. *Kuebler v. Cleveland Lithographers & Photo. U. Loc. 24-P*, 473 F.2d 359, 364 (6th Cir.1973). A number of other courts have also held that under section 411(a)(5), "an unbiased tribunal is a fundamental requisite to a fair hearing." *Stein v. Mutuel Clerks' Guild of Mass., Inc.*, 560 F.2d 486, 491 (1st Cir. 1977); *see also Goodman v. Laborers' Intern. Union of North America*, 742 F.2d 780, 784 (3d Cir.1984); *Myers v. Affiliated Property Craftsmen, etc.*, 667 F.2d 817, 820 (9th Cir.1982). Indeed, the Ninth Circuit wrote in *Meyers*, 667 F.2d at 820, that "[w]hen a member of a trial committee has admitted to prejudging the guilt of the accused before the hearing, the courts have not hesitated to rule there was no full and fair hearing as required by the L.M.R.D.A."

Yet, most of these decisions have concerned disciplinary hearings conducted before a trial committee of limited size. Here Murphy's trial was held before the Union membership as a whole.

There is nothing in the Landrum-Griffin Act to indicate that such a trial before the entire membership is, by itself, inappropriate or violative of the Act. The Act requires only a full and fair hearing, the exact nature of which, we believe, is bound to be affected in a most practical way by the very nature of the body before which that hearing is held. We readily recognize that the members, who are the decision-makers in such cases, will very probably be personally familiar with at least the parties and possibly the facts of the occurrence in question. These "jurors" will enter the tribunal with their prejudices and preconceived ideas of guilt and innocence. In a trial before the union membership as a body, such individual biases of some members do not taint the entire proceeding.

In *Curtis v. International Alliance of Theatrical Stage Employees*, 687 F.2d 1024 (7th Cir.1982), the plaintiff contended that he was denied a fair disciplinary hearing because one executive committee member, who was biased against him, was allowed to vote on his guilt as a member of the jury at the disciplinary hearing and then to vote on his punishment as a member of the executive committee. *Id.* at 1030. The Seventh Circuit rejected Curtis' contentions. The court found that the actions of McLachlan, the allegedly biased executive committee member, "did not affect the decision on Curtis's guilt or innocence [or] otherwise compromise [his] fair hearing. [A]ny influence McLachlan may have had was well-diluted." *Id.* at 1031. The Seventh Circuit concluded that "[t]he conviction by a vote of the entire membership does not invoke [the] concerns [of the Landrum-Griffin Act] simply because several members voting may have had preconceived notions of the plaintiff's guilt or innocence before hearing the full evidence." *Id.* at 1030–31. We fully agree.

However, in this case Murphy did not claim just that a few possibly biased jurors voted at his disciplinary hearing. Rather, Murphy claimed that Judge Lambros found that the Union leadership intentionally manipulated the voting to obtain Murphy's conviction. In contrast, the Seventh Circuit expressly noted in *Curtis* that Curtis did "not contend that McLachlan attempted to influence other members during the balloting." *Id.* at 1030. Here the Union's deliberate attempt to change the composition of the tribunal and thus "to stack the deck," *Myers*, 667 F.2d at 821, against Murphy distinguishes this case from *Curtis*. We cannot escape the conclusion that the Union's actions here tainted the entire proceeding and violated Murphy's section 411(a)(5) rights.

### D. Reinstatement Refusal

The district court found that the Union also violated Murphy's section 411(a)(5) rights by rejecting his petition for reinstatement to union membership. Ostensibly as punishment for his conviction for the theft of the election control list, Murphy was suspended from membership in Local 18 for a period of two years. On March 30, 1974, just before the two-year period expired, Murphy requested the forms which must be submitted by a member desiring reinstatement. No forms were sent, and on April 6, 1974, Local 18's Executive Board voted to refuse Murphy reinstatement because he then had four legal actions pending against the Union. On April 11, 1974, Possehl wrote a letter to Murphy telling him to appear in person at the District One office to obtain the necessary forms. Murphy did not do so. Judge Lambros concluded that the Union's actions were tantamount to an expulsion of Murphy from the Union and that this discipline, imposed without any procedural safeguards, violated Murphy's rights under 29 U.S.C. § 411(a)(5) and 29 U.S.C. § 529.

In its appeal, the Union claims that because Murphy never responded to Possehl's letter requiring him to pick up the reinstatement forms in person, Murphy was not reinstated due to his own inaction.

The Union's argument did not convince Judge Lambros, nor does it convince us. Possehl's letter to Murphy was sent only five days after the Executive Board had voted to refuse any reinstatement. Murphy's contention that Possehl's letter was not a sincere attempt to assist him in obtaining reinstatement seems well-grounded. Judge Lambros correctly found that despite Possehl's letter the Executive Board's action effectively expelled Murphy from the Union without due process and violated section 411(a)(5) and section 529.

### E. Intimidation and Physical Violence

The district court concluded that the Union violated Murphy's section 411(a)(1) and (2) rights by preventing him through intimidation and physical violence from participating in intraunion political activities. Judge Lambros found that the Local 18 leadership had threatened and attacked the District One dissidents, including Murphy, in an effort to compel them to stop their dissident activities. Murphy presented testimony to show that he was assaulted twice: first by two District Two Executive Board members at a hotel after an Executive Board meeting and then by two District Three members before a union meeting.

The Union contends that Judge Lambros' finding of a section 411 violation based on these occurrences was erroneous on several grounds: first, any intimidating speech was constitutionally protected; second, Murphy was not intimidated by any of the Union's actions; and, finally, the Union did not authorize or ratify the attacks against Murphy.

The district court based its finding of intimidation in large part on the physical attacks on Murphy and other dissidents and not on any speech, constitutionally protected or otherwise. Judge Lambros wrote that Murphy had not

> proven that he was denied his right to speak at union meetings. However the violence inflicted upon plaintiff has cer-

tainly precluded his attendance at certain meetings. Further; said violence considered in conjunction with the economic discrimination suffered by plaintiff clearly serves as an intimidating factor in plaintiff's participation in union meetings.

Dist.Ct. op., 99 L.R.R.M. at 2114 n. 325. Judge Lambros' findings are fully adequate. It is absurd to require that a union *succeed* in an attempt to intimidate dissidents before a section 411 violation is established. Finally, the district court found sufficient evidence that Murphy's attackers were acting on behalf of the union leadership and were attempting to suppress Murphy's participation in union activities. This evidence of intimidation and physical violence fully supported Judge Lambros' finding that Murphy's section 411 rights had been violated.

### F. Conclusion

■ Although the district court found that appellants had violated Murphy's rights under 42 U.S.C. § 1985(3), 29 U.S.C. § 185, and several common law theories as well as the Landrum-Griffin Act, the court awarded Murphy only one total amount as money damages:

> The Court has given long and careful consideration to the damages which are to be awarded in this case. Damages may not simply be awarded separately with respect to each offense for which defendants have been found liable, and then tallied to arrive at a final figure. Rather, damages must be reflective of the injuries plaintiff has suffered as a result of defendants [sic] overall effort to suppress plaintiff as a dissident, which effort includes the offenses tried in this lawsuit.

Dist.Ct. op., 99 L.R.R.M. at 2133. The award was to compensate Murphy for "pain and suffering, humiliation, emotional distress, mental anguish and loss of the right to participate in union activities for the period of two years" in the amount of $10,000, and for lost wages in an undetermined amount. *Id.* Upon the proofs the award was entirely reasonable and supported by the findings. We need not, therefore, address the additional arguments raised by the Union to the contrary.

Two issues remain: the award of attorneys' fees and whether evidence on the allegedly invalid section 1985(3) cause of action prejudiced the Union's other claims.

### IV. ATTORNEYS' FEES

In his post-judgment order Judge Lambros awarded Murphy $133,340 in attorneys' fees under a "bad faith" theory, a "common benefit" theory, and 42 U.S.C. § 1988.[7] Relying on the Sixth Circuit's en banc decision in *Shimman v. International Union of Operating Engineers, Local 18*, 744 F.2d 1226 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985), the Union contends that the attorneys' fee award must be overturned. The Union also argues that the award allowed was excessive.

In *Shimman v. International Union of Operating Engineers, Local 18*, 744 F.2d 1226 (6th Cir.1984) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985), the Sixth Circuit reversed the district court's award of attorneys' fees finding neither "the bad faith" nor the "common benefit" theories applicable. The Shimman brothers were District Two dissidents one of whom, like Murphy, brought a successful LMRDA suit against Local 18. *See Shimman v. Frank*, 625 F.2d 80 (6th Cir.1980). In an en banc decision authored by Judge Kennedy, the Sixth Circuit disallowed the district court's award of attorneys' fees in that case. 744 F.2d at 1238.

Judge Kennedy stated that there are three categories of bad faith considered by courts in construing the "bad faith" exception to the American Rule that "a prevailing party may not ordinarily recover attorneys fees," *id.* at 1229: "(1) bad faith oc-

---

7. Because we conclude that Murphy's section 1985(3) cause of action must fail, *see infra* at 128, the attorneys' fee award here must be upheld, if at all, on one of the common law grounds and not under section 1988.

curring during the course of the litigation; (2) bad faith in bringing an action or in causing an action to be brought; and (3) bad faith in the acts giving rise to the substantive claim." *Id.* at 1230 (footnote omitted). After deciding that only the third category of bad faith existed in the *Shimman* case, *id.*, Judge Kennedy concluded that "[t]o allow an award of attorney fees based on bad faith in the act underlying the substantive claim would not be consistent with the rationale behind the American Rule regarding attorney fees." *Id.* at 1231. She, therefore, held "that the bad faith exception to the American Rule does not allow an award of attorney fees based only on bad faith in the conduct giving rise to the underlying claim." *Id.* at 1233.

Here only bad faith inherent in the Union's conduct toward Murphy is at issue. No bad faith in the handling or defense of this litigation is alleged. Therefore, under *Shimman*, Murphy cannot recover attorneys' fees on a "bad faith" theory. Nonetheless, Murphy has demonstrated fully his entitlement to recovery of attorneys' fees on a "common benefit" theory.

*Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), established the general principle that a plaintiff may be awarded attorneys' fees if in bringing his suit, he " 'necessarily rendered a substantial service to his union as an institution and to all of its members ... [by] dispel[ling] the "chill" cast upon the rights of others.' " *Shimman*, 744 F.2d at 1234 (*quoting Hall v. Cole*, 412 U.S. at 8, 93 S.Ct. at 1948). In *Shimman*, Judge Kennedy held that John Shimman could not recover attorneys' fees under the "common benefit" theory, holding that while Shimman's suit could have been of some benefit to the union members in democratizing the union, that benefit was not a direct one; rather, it was one of "general deterrence." 744 F.2d at 1234–36 & n. 13. Holding that this "incidental benefit ... will not justify a fee award," Judge Kennedy found the "common benefit" theory inapplicable to Shimman's case. *Id.* at 1235–36.

■ The distinctions between *Shimman* and the instant case are significant. First, no injunctive relief was ordered in Shimman's case. *Id.* at 1235 n. 13. Here Judge Lambros ordered injunctive relief relating to the handling of and access to the Union's work referral system and, in his post-judgment order, adopted a plan containing other significant remedial measures to be undertaken by the Union. That post-judgment plan was submitted by the Union in order to have the punitive damage award against it vacated. This is a second difference between *Shimman* and this case: because the Union submitted the post-judgment remedial plan here, the $150,000 punitive damage award was vacated. If the Union had not adopted these remedial measures of general benefit to Union members, Murphy alone would have received $150,-000. In *Shimman*, Shimman received $145,000 in punitive damages, an amount greater than the attorneys' fees he requested. *Id.* at 1235. Judge Kennedy found that other union members would not benefit from the $145,000 award and that Shimman could pay his attorneys' fees out of that award. *Id.* Therefore, Shimman was left no worse off than other union members even though he prosecuted the action. Here, on the other hand, without the award of attorneys' fees, Murphy will receive *no* punitive damages and only $10,000 and lost wages in compensatory damages. Thus, without the attorneys' fee award, Murphy would suffer significant financial loss for litigating a suit that resulted in substantial benefit to the Union as a whole.

On these two bases, we believe that the attorneys' fee award in Murphy's favor is fully justified upon a "common benefit" theory.

The Union also contends that the amount of attorneys' fees awarded was excessive because the district court failed to take into account the relative lack of success Murphy allegedly achieved in prosecuting this case. Specifically, the Union argues that the court erred in failing to consider the "results obtained" factor developed for fee determinations by the Fifth Circuit in

*Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974), and allegedly adopted by the Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). We do not read *Hensley* as mandating the mechanical "checklist" approach of *Johnson*, although its use might be helpful.

While the Supreme Court did discuss *Johnson* favorably in *Hensley*, the Court noted that

> The district court also may consider other factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (CA5 1974), though it should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate. See *Copeland v. Marshall*, 205 U.S.App.D.C. 390, 400, 641 F.2d 880, 890 (1980) (en banc).

461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. Thus, the *Hensley* decision did not approve a checklist approach or disapprove the approach of the Sixth Circuit in *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). *See also United Slate, Tile & Composition v. G & M Roofing*, 732 F.2d 495, 503 n. 3 (6th Cir.1984).

In *Northcross*, the Sixth Circuit expressly rejected this checklist approach to fee determinations. Instead, the Sixth Circuit held that a district court need only consider the hours of service provided (and whether those hours were reasonable under the circumstances) and a reasonable rate of compensation. 611 F.2d at 636–39. The Sixth Circuit found that such an approach "will take into account all the relevant factors, and will lead to a reasonable result." *Id.* at 642.

In short, we find nothing in *Hensley* or in *Northcross* to warrant distributing the district judge's award of attorneys' fees or the amount thereof. It appears clear from the record that Murphy's claims were closely interrelated and arose from one common core of facts. Also, Murphy received compensatory damages and injunctive relief that signified a substantial victory. It seems that the award of fees and the amount of those fees were justified and that a remand is not necessary.

## V. ADMISSION OF DISCRIMINATION EVIDENCE

The Union argues that the trial court improperly allowed Murphy to introduce evidence concerning the allegedly class-based discrimination necessary for a claim under 42 U.S.C. § 1985(3), evidence which, it argues, was irrelevant to the section 1985(3) claim and prejudiced the court's findings on the other claims. The Union especially objects to the evidence concerning incidents outside District One involving the Shimman brothers.

■ However, as Murphy points out, the evidence relating to the section 1985(3) cause of action was also relevant to other claims raised, particularly the pendent conspiracy claim. Moreover, even if some of this evidence was relatively prejudicial and relevant only to the section 1985(3) cause of action, this was a bench trial. We are confident that Judge Lambros, an experienced trial judge deciding the case without a jury, was able fairly to apply the proof to the appropriate cause of action. *See Ghandi v. Police Dept. of City of Detroit*, 747 F.2d 338, 355 (6th Cir.1984); *Northwestern Nat. Cas. v. Global Mov. & Stor. Inc.*, 533 F.2d 320, 324 (6th Cir.1976). We are fortified in this belief by the relatively conservative approach Judge Lambros took in reaching his decision generally.

## VI. MURPHY'S OTHER CLAIMS

Murphy moved and was permitted to amend his complaint to add the section 1985(3) cause of action and claims under other sections of the LMRDA (29 U.S.C. §§ 481(c), 501, 523, 529 and 530) and the Labor-Management Relations Act, 29 U.S.C. § 185, as well as pendent state claims of assault and battery, breach of contract, and conspiracy. It was not error in the circumstances for the court to have allowed this belated amendment of the

complaint. Fed.R.Civ.P. 15. The amendment does not appear to have significantly increased the burden of the defense, and no significant amount of additional evidence, other than that adduced in support of the original section 411 claims, was necessary or introduced. At the same time, we agree with the Union that Murphy's section 1985(3) claim is barred by the en banc decision in *Shimman v. International Union of Operating Engineers, Local 18*, 744 F.2d 1226 (6th Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).

■ The facts in *Shimman* are quite similar to and in many particulars overlap those here. Judge Kennedy found that the conspirators' "racial, or perhaps otherwise class-based, invidiously discriminatory animus," which *Griffin v. Breckinridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971), held necessary to establish a cause of action under section 1985(3), was missing in the dispute between dissenting union members and the union leadership. 744 F.2d at 1236–37; *see also Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). We hold Murphy's claim under section 1985(3) is likewise foreclosed for the same reasons.

The other claims challenged by the Union on appeal also appear to be subject to potential defenses of some significance. Yet, we agree with Murphy's suggestion in his brief on appeal that the judgment of the district court may be affirmed entirely on the basis of 29 U.S.C. §§ 411 and 412. The remaining independent state and federal law grounds added by amendment are essentially cumulative. Their correct resolution is not required since the court's judgment and the relief granted may stand solely upon its findings of liability under 29 U.S.C. §§ 411 and 412. We, therefore, decline to address those issues and base our affirmance upon Murphy's section 411 claims.

## VII. CLAIMS RAISED BY MURPHY ON CROSS–APPEAL

Murphy raises three issues on cross-appeal. First, he argues that the district court erroneously found that the Union did not violate section 411 by refusing to give the dissidents equal coverage in and equal access to the Union newsletter, the *Buckeye Engineer*. Second, Murphy claims that the district court should have awarded him expert witness fees as part of his costs, and, third, that Judge Lambros erred in vacating his award of punitive damages against the Union.

### A. Buckeye Engineer

In his complaint, Murphy alleged that the Union denied the dissidents access to the Union's channels of membership communication, including the *Buckeye Engineer* (the monthly Union newspaper), in violation of 29 U.S.C. § 411. Judge Lambros analyzed the issue in terms of 29 U.S.C. § 481(c), part of Title IV of the LMRDA, rather than section 411 of that Act. His analysis of the section 481(c) claim was correct.

■ Section 481(c) prohibits unions from discriminating against or in favor of any candidate for union office with regard to the use of membership lists and the distribution of campaign literature. Under section 481(c), a "bona fide candidate for office" in a union may enforce that section in a district court. Otherwise, remedies under Title IV are "exclusive"; that is, they must be pursued by filing a complaint with the Secretary of Labor after contractual remedies have been exhausted. Only the Secretary may then institute a civil suit against the union. 29 U.S.C. §§ 482–83; *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964).

Judge Lambros found that Murphy is not currently a candidate for any specific election and that he is, thus, not challenging the use of union funds to discriminate against him in any specific upcoming election. Murphy apparently does not dispute this finding. Therefore, even though Murphy has been a candidate in the past and may again be one in the future, Judge Lambros correctly decided that Murphy may not invoke section 481(c) to compel the

union to grant him access to the *Buckeye Engineer* at this time. Judge Lambros' opinion to this effect, Dist.Ct. op., 99 L.R. R.M. at 2120–21, was the subject of favorable comment in *Camarata v. International Brotherhood of Teamsters*, 478 F.Supp. 321 (D.D.C.1979), *aff'd without opinion*, 108 L.R.R.M. 2924 (D.C.Cir.1981). *See also Calhoon v. Harvey*, 379 U.S. 134, 140 n. 13, 85 S.Ct. 292, 296 n. 13, 13 L.Ed.2d 190 (1964).

The question then becomes whether Murphy may obtain redress for the alleged discrimination against dissidents in the *Buckeye Engineer* as a violation of his section 411 rights.

If Murphy's claims concerning the *Buckeye Engineer* relate solely to past elections, his claims are foreclosed by Title IV of the LMRDA. "[T]he exclusivity provision included in § 403 of Title IV [29 U.S.C. § 483] plainly bars Title I [section 411] relief when an individual union member challenges the validity of an election that has already been completed." *Local No. 82, Furniture and Piano Moving, etc. v. Crowley*, 467 U.S. 526, 104 S.Ct. 2557, 2566, 81 L.Ed.2d 457 (1984) (footnote omitted).

However, "[t]he exclusivity provision of Title IV may not bar post-election relief for Title I claims or other actions that do not directly challenge the validity of an election already conducted." *Id.*, 104 S.Ct. at 2566 n. 16.[8] *See also Anson v. National Maritime Union of America*, 595 F.Supp. 847 (S.D.N.Y.1984). Here Murphy's complaints with regard to the *Buckeye Engineer* are not predominantly campaign-related. Murphy's First Amended Complaint charged that the Union denied the dissidents "[a]ccess to the channels of membership communication maintained by the ... Un-

ion, including regular and special membership mailings and publications. The individual defendants ... controlled the contents of special mailings and publications to the membership so as to exclude input by Plaintiff and other dissident members." These allegations deal with continuing unfair coverage of the dissidents rather than simply illicit campaigning for the Union incumbents. In his findings of fact, Judge Lambros found that while "[n]umerous articles ... appeared in The Buckeye Engineer in connection with upcoming elections[,] [o]nly one item [could] be construed as referring to the dissident movement." Dist.Ct. op., 99 L.R.R.M. at 2105. That item merely encouraged members to vote, stating " 'We all know of cases in other unions where a small minority was able to win an election just because most of the members figured that there was no need to vote.' " *Id.* It seems, therefore, that Murphy's concerns about the *Buckeye·Engineer* do not relate to improper campaigning and that his section 411 remedies are not foreclosed because he failed to pursue any section 481 remedies.

We must still determine whether Murphy has made out a section 411 violation. Murphy relies primarily on Judge Jones' opinion in *Knox County Local v. National Rural Letter Carriers' Ass'n.*, 720 F.2d 936 (6th Cir.1984).

In *Knox*, the Knox County Local tried to place an advertisement in *The National Rural Letter Carrier* to oppose one provision of a collective bargaining agreement negotiated by the national union. *The National Rural Letter Carrier* was the national union magazine financed in part by union funds. Although the magazine accepted other commercial advertisements

---

8. These statements are not strictly essential to the Supreme Court's holding in the case, since *Crowley* concerned the application of Title IV's exclusivity provision *during* the course of a union election. 104 S.Ct. at 2567. The Court concluded:

> In sum, whether suits alleging violations of Title I of the LMRDA may properly be maintained during the course of a union election depends upon the appropriateness of the rem-

edy required to eliminate the claimed statutory violation. If the remedy sought is invalidation of the election already being conducted with court supervision of a new election, then union members must utilize the remedies provided by Title IV. For less intrusive remedies sought during an election, however, a district court retains authority to order appropriate relief under Title I.

*Id.* at 2571.

from both members and outside merchants, the national union refused to print the Local's ad because "it would create 'internal union strife.'" *Id.* at 937.

Judge Jones held that the national's refusal to publish the ad was a violation of section 411(a)(1) and (2). He wrote that section 412

> grants to the courts latitude in fashioning appropriate relief to open channels of communication among members, to facilitate the kind of informed debate which leads to enlightened self-government, and to promote the development of democracy within the union. The latitude granted to us by Title I clearly does not permit unjustifiable judicial interference with internal union affairs. That latitude, however, no less clearly does permit judicial intervention to protect the rights of union members to free speech and to receive information, without which they would be unable to exercise fully their right to participate in deliberations on union affairs. . . .
>
> . . . Before us then is not the issue of whether the courts should ever interfere with internal union activity, but whether the principles underlying Title I justify our interference to the extent of requiring equal access to the union's national magazine in this case.
>
> . . . While we recognize that the First Amendment in and of itself does not require a private publication to publish any information submitted by an outsider, *see, e.g., Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), we are guided by First Amendment principles in determining whether Title I requires the national union to allow Knox County Local members access to its publication.
>
> So guided, we conclude that, in this case, Title I requires the NRLCA to publish the paid advertisement submitted by Knox County Local.

*Id.* at 939 (footnote omitted). The court determined that the "internal union strife" the national union allegedly feared did not justify the national's actions because the

"strife" would not amount to "imminent lawless action" or be "unreasonably disruptive." *Id.* at 940. Moreover, Judge Jones found that the national's refusal was a content-based restriction on expression prohibited by the First Amendment as embodied in the Landrum-Griffin Act. *Id.* The court stressed that "[w]hen the [national union] opened its magazine to its members and to 'outside' merchants, it effectively opened the forum to the public. Having done so, [it] cannot unreasonably preclude ads submitted by its members based on their content." *Id.* Finally, Judge Jones rejected the argument that the denial of access was permissible because the Local "has other effective avenues for expressing their views." *Id.*

■ Murphy contends that as in *Knox,* the Union here has denied the dissidents access to the only feasible channel of communication with other Union members. As in *Knox,* the *Buckeye Engineer* is distributed to all 16,000 Local 18 members and is supported by union funds. Here, however, the similarities end, and we find ourselves agreeing with the Union that other factors justify Judge Lambros' result.

In *Knox,* the Local had made an express request to have a specific ad printed in the magazine at their expense. Here Judge Lambros found that other than evidence concerning a single letter (which was printed by the Union in part), "there has been no evidence adduced that dissidents even requested Possehl [who was the editor] to print any other material in The Buckeye Engineer. It does not appear that the rebels ever sought to have the platforms of the respective political factions presented in The Buckeye Engineer." Dist.Ct. op., 99 L.R.R.M. at 2106. Thus, other than the one letter, part of which was in fact printed, no specific request for any publicity was made.

This failure to request any access demonstrates another difference between *Knox* and the instant case. In *Knox,* the relief ordered by the court could consist of merely requiring the union to accept the Local's ads. Here the relief sought is much broad-

er; Murphy requests a remand to the district court "for the determination of an appropriate remedy to prevent future discrimination in the access to, and coverage in, the *Buckeye Engineer.*" Appellee Murphy's Brief at 41. Judicial supervision of a union newsletter to insure equal treatment of varying points of view would certainly involve a greater degree of judicial intervention in union affairs than just ordering a policy of openness in accepting advertising. This problem cannot be solved by ordering the Union to accept any ads submitted by the dissidents because, unlike the magazine in *Knox,* the *Buckeye Engineer* apparently does not accept any ads. The relief sought by Murphy, therefore, goes beyond that sought and granted in *Knox.* Because of the "general congressional policy to allow unions great latitude in resolving their own internal controversies," *Calhoon v. Harvey,* 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964), we believe Judge Lambros' ruling here is consistent with the admonition in *Knox* that any grant of relief must not result in "unjustified judicial interference with internal union affairs." 720 F.2d at 939. *See also Sheldon v. O'Callaghan,* 497 F.2d 1276 (2d Cir.), *cert. denied,* 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974), holding that while the LMRDA requires the union to give dissidents some means of reaching union members with their views, those means need not invariably include access to a union newspaper.

Here Judge Lambros found that the dissidents had not made any request to have literature mailed to union members at the dissidents' expense and that Local 18 had not used its membership list discriminatorily. Yet, as part of the arrangement in which he vacated punitive damages against the Union, Judge Lambros ordered the Union to make the membership list available to all candidates for office. We cannot find that Judge Lambros erred in thus tailoring relief to the particular facts before him here.

### B. Expert Witness Fees

Murphy's second claim in his appeal is that Judge Lambros erred in refusing to award him expert witness fees as costs. Murphy employed one expert to do a statistical analysis showing that the Union had discriminated against the dissidents with regard to work referrals and another expert to calculate his lost earnings because of that discrimination. Murphy requested an award of these experts' fees as costs under Fed.R.Civ.P. 54(d). Judge Lambros denied the request, finding that under *Henkel v. Chicago, etc. Ry.,* 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386 (1932), he had no discretion to award expert witness fees. Here Murphy contends that *Henkel* is "of historical interest only" and that such fees may be awarded.

Rule 54(d) provides that, in general, "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." The term "costs" is not defined in the rule. By statute, however, Congress has established that

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

28 U.S.C. § 1920. The fees of experts who are not court-appointed (as here) are not included in section 1920.

In *Henkel v. Chicago, etc. Ry.,* 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386 (1932), the

Supreme Court held that when an award of expert witness fees is not expressly allowed by statute, it may not be taxed as costs. There the Court reversed the district court's award, holding that federal, not state, law governs the award of costs and that under federal law only the witness fees specified by statute (e.g., mileage and per diem) may be taxed: "additional amounts paid as compensation, or fees, to expert witnesses cannot be allowed or taxed as costs in cases in the federal courts." *Id.* at 446, 52 S.Ct. at 225.

Murphy argues that the Supreme Court's ruling in *Henkel* was modified in *Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964), and some courts have so held. *See Paschall v. Kansas City Star Co.,* 695 F.2d 322, 338–39 (8th Cir.1982), *overruled on reh'g en banc (on other grounds),* 727 F.2d 692 (8th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984); *Roberts v. S.S. Kyriakoula D. Lemos,* 651 F.2d 201 (3d Cir.1981).[9] In *Roberts,* for example, the Eighth Circuit adopted a district court's suggestion that *"Farmer* had qualified *Henkel.... Farmer* appears to hold that Rule 54(d) authorizes district judges to exercise discretion—albeit 'sparing'—to award costs not specifically enumerated in § 1821.... We therefore agree ... that *Farmer* affords a district court equitable discretion to award expert fees when the expert's testimony is indispensible to determination of the case." 651 F.2d at 206.

Other courts, however, have rejected this analysis. For instance, in *Quy v. Air America, Inc.,* 667 F.2d 1059, 1067 (D.C. Cir.1981), the D.C. Circuit relied on *Henkel* to hold that expert witness fees may not be recovered as costs. The D.C. Circuit, thus, applied *Henkel* as good law and held that under what it believed was "the prevailing view among the circuits," expert witness

fees over and above the statutory allowance may not be recovered. *Id.* at 1066–68. While all other circuits have not discussed the possible conflict between *Henkel* and *Farmer,* most appear to follow *Henkel* as good law even after *Farmer. See, e.g., Bosse v. Litton Unit Handling Systems, Inc.,* 646 F.2d 689, 695 (1st Cir.1981); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 309 n. 75 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Specialty Equipment & Mach. Corp. v. Zell Motor Car Co.,* 193 F.2d 515, 521 (4th Cir.1952);[10] *Baum v. United States,* 432 F.2d 85, 86 (5th Cir. 1970); *State of Ill. v. Sangamo Const. Co.,* 657 F.2d 855, 865 (7th Cir.1981); *Cleverock Energy Corp. v. Trepel,* 609 F.2d 1358, 1363 (10th Cir.1979), *cert. denied,* 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980); *Kivi v. Nationwide Mut. Ins. Co.,* 695 F.2d 1285, 1289 (11th Cir.1983).

The law in the Sixth Circuit is unclear. In *Johnson v. Hubbard,* 698 F.2d 286 (6th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 282, 78 L.Ed.2d 260 (1983), and *Northcross v. Board of Ed. of Memphis City Schools,* 611 F.2d 624 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980), the court at least implied that expert witness fees may be awarded as costs. In *Johnson,* for example, the court stated that "[u]nder 28 U.S.C. § 1920(3), the court may tax as costs the fees paid to certain witnesses, within its discretion. This section has been construed on numerous occasions to encompass only expert testimony in a very restricted number of cases." 698 F.2d at 291 n. 5. While this statement was clearly dictum in *Johnson,* it does indicate some approval of taxing expert witness fees as costs.

On the other hand, in *Ott v. Speedwriting Publishing Co.,* 518 F.2d 1143, 1149 (6th Cir.1975), Judge Lively held that "the

**9.** Without discussing *Henkel* or *Farmer,* the Ninth Circuit has also held that consulting and expert witnesses fees may be taxed as costs. *See Thornberry v. Delta Air Lines, Inc.,* 676 F.2d 1240, 1245 (9th Cir.1982), *vacated on other grounds,* 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1311 (1983).

**10.** This decision predates *Farmer.* However, it appears that no Fourth Circuit opinion discussing this question after *Farmer* has been issued.

fees of expert witnesses are not included in the recoverable costs in an antitrust action." Judge Lively's ruling was based on the fact that antitrust plaintiffs may only recover those costs available under Rule 54(d) and 28 U.S.C. § 1920. The opinion at least implies, therefore, that expert witness fees may not be recovered under Rule 54(d) or section 1920.

Thus, the three Sixth Circuit cases appear to conflict. The majority rule in the other circuits, however, seems to be that expert witness fees may not be awarded as costs.

■ In any event, we note that those courts which allow an award of expert fees restrict recovery to cases in which "the expert's testimony was crucial to the resolution of the case." *Paschall v. Kansas City Star Co.*, 695 F.2d 322 at 338 (8th Cir.1982). Because it appears unlikely that the testimony of Murphy's experts was "crucial to the resolution of the case," or that Judge Lambros found it so, we uphold his denial of fees.

### C. Punitive Damages

■ Murphy asserts that the court erred in vacating its earlier award of punitive damages against the Union when the Union adopted a plan to open up its election process. Murphy contends that the remedial measures to which the Union agreed were either useless or had already been required by the district court's judgment. He claims, therefore, that the vacation of the punitive damage award allowed the Union to "double dip," that is to use the plan both to comply with the district court's judgment and to avoid the punitive damage award. He argues that the punitive damage award should have been allowed to stand.

Of course, we do not know all of the considerations which went into the district court's final decision to vacate the award of punitive damages. Yet, the decision was quite clearly related to the enlargement of the injunctive relief previously entered by the court. The modified injunctive relief included provisions for making the Union's

decisional and referral processes more democratic.

Certainly, some uncertainty had to have attended the trial judge's determination to award punitive damages in the first place, and the Union has claimed in this appeal that under the original complaint, the trial judge was without authority to award such damages. Indeed, Judge Lambros found that he did not have authority to award punitive damages for violations of section 411. The Union has also argued that the punitive damages were unavailable under section 301 of the LMRA and under 42 U.S.C. § 1985(3). We, of course, ruled earlier that no case was made out under section 1985(3). Also, although we have not reached the issue of whether the district court properly found a section 301 violation, punitive damages may not be awarded under section 301. *Farmer v. ARA Services, Inc.*, 660 F.2d 1096, 1106–07 (6th Cir. 1981).

Therefore, it is apparent that any award of punitive damages, in Judge Lambros' view, would have had to depend upon the viability of the pendent state claims. While there is little doubt that under Ohio law punitive damages may be awarded for the state tort of conspiracy when the tort was committed maliciously, *see Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 327 N.E.2d 654, 658 (1975); *Oskamp v. Oskamp*, 20 Ohio App. 349, 152 N.E. 208, 210 (1925), Judge Lambros had to be concerned that an award of punitive damages based upon amended claims which were only added during the course of trial might jeopardize the validity of the final judgment upon any appeal. He could have decided that a punitive damage award which was dependent on the belated amendments to the complaint was vulnerable on appeal. The Union could have claimed that the injection of the state causes of action so late in the trial resulted in potential prejudice to them in the tactical decisions which they made in connection with the trial itself.

Whatever may have been his considerations, it is apparent that Judge Lambros

converted an uncertainty into a practical result that he thought was consistent with the equities of the case. We are left, in the end, with evaluating whether the final judgment as modified represents in itself a proper exercise of judicial discretion and not whether the original award was not authorized or did not represent a proper exercise of discretion.

This litigation was both involved and lengthy. The legal issues were difficult and in many instances, as we have pointed out, without any clear answer in existing law. While substantial evidence supports Judge Lambros' determination of bad faith in the Union's conduct, it is apparent from an examination of the entire litigation that it had many facets and that the dissidents, including Murphy, were not invariably free of some fault. In a record so fraught with conflict and credibility determinations, an appellate court should be chary of substituting its judgment for that of a trial judge who obviously spent much time and care in reaching what he conceived to be a fair and legally supportable result. In other words, we conclude that under the circumstances here, it was not an abuse of judicial discretion for Judge Lambros to vacate the award of punitive damages and to broaden the equitable relief awarded. We do not believe we are required to measure the deterrent value of the punitive damages which were vacated against the value of the additional injunctive relief in terms of benefit to Murphy and the Union membership. This was a difficult decision, and we will not disturb it.

AFFIRMED.